**Gyula FEKETE, Plaintiff,**

v.

**UNITED STATES STEEL CORPORA-TION, Defendant.**

**Civ. A. No. 68–1351.**

United States District Court,
W. D. Pennsylvania.

Feb. 7, 1973.

Marjorie H. Matson, Pittsburgh, Pa., for plaintiff.

Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for defendant.

## OPINION

SCALERA, District Judge.

### HISTORY

This is a Title VII Civil Rights action in which plaintiff, Gyula Fekete, a native of Hungary, alleges he was discriminated against while employed by defendant, United States Steel Corporation, by reason of his national origin. He avers he was discriminatorily discharged and that before and after his discharge he was discriminated against with respect to the compensation, terms, conditions and privileges of his employment.

Plaintiff was discharged from his employment on October 21, 1967. On July 18, 1968, he was reinstated with full back pay as a result of an arbitration decision, on grounds that he had not been sufficiently warned that past derelictions in his work would be considered in later disciplinary proceedings.

While arbitration proceedings related to the discharge were pending, plaintiff filed a charge with the Equal Employment Opportunity Commission on January 12, 1968, alleging that he had been discriminated against by his employer due to his national origin.

The Equal Employment Opportunity Commission referred plaintiff's complaint to the Pennsylvania State Human Relations Commission pursuant to Section 706 of the Civil Rights Act. On May 21, 1968, after investigation and review, the Pennsylvania Commission found that no probable cause existed for crediting the allegations of the complaint.

The Equal Employment Opportunity Commission then conducted its own investigation of the charges and on September 30, 1968, found that reasonable cause did not exist to believe respondent was in violation of Title VII of the Civil Rights Act. The plaintiff, Mr. Fekete, was notified of the Commission's decision by letter dated October 17, 1968.

This complaint was filed on November 21, 1968. On June 11, 1969, Judge Gerald J. Weber, 300 F.Supp. 22, granted defendant's motion to dismiss the complaint on grounds that the district court lacks jurisdiction to entertain a complaint alleging discrimination in employment when the Equal Employment Opportunity Commission finds there is no reasonable cause to believe discrimination has occurred.

The court also found that since the only specific relief authorized for unlawful discrimination under Title VII is reinstatement with back pay, which plaintiff had received by virtue of his arbitration award, his claim for relief based upon an alleged discriminatory discharge was moot and should be dismissed.

The United States Court of Appeals for the Third Circuit, 424 F.2d 331, on April 13, 1970 reversed this decision, holding that appellant was entitled to maintain an action for alleged employment discrimination due to his national origin, even though the Equal Employment Opportunity Commission found that reasonable cause did not exist to believe that the employer was in violation of the Civil Rights Act of 1964. The Court of Appeals also held that the action had not been rendered moot by the arbitration award since plaintiff's complaint sought an injunction against an alleged continuing course of conduct not remedied by plaintiff's reinstatement to his job with back pay. The case was remanded to this court for further proceeding consistent with the decision.

On August 20, 1970, Judge Weber stayed further pretrial procedure for one year on representation that plaintiff was in such poor health that he was unable to prepare for trial. Pretrial procedure was reinstated by order of court dated September 23, 1971, and on July 10, 1972, a pretrial conference was held.

On July 19, 1972, plaintiff filed a motion for leave to amend and supplement the complaint, in which plaintiff requested that he be permitted to change his request for relief from a request for an injunction against further discrimi-

nation to a request for money damages. Plaintiff moved to strike subparagraphs (b) and (c) of paragraph 9 of the original complaint which requested the court to:

b. Enjoin defendant from engaging in unlawful employment practices and, particularly, from discriminating against plaintiff by reason of his nationality as to his compensation, terms, conditions and privileges of employment;

c. Grant such affirmative relief, including money damages, as to the court shall seem appropriate;

and substitute the following requests for relief:

b. Award plaintiff compensatory damages, including compensation for lost wages and medical expenses from September of 1969, when plaintiff became totally disabled.

c. Award plaintiff punitive damages by reason of gross discrimination against plaintiff throughout his employment by defendant.

d. Award plaintiff nominal damages for violation of his constitutional rights.

Counsel for plaintiff indicated by affidavit that since September 1969, subsequent to the filing of the original complaint, plaintiff had been physically unable to work and would never be able to return to his employment. Under such circumstances, it was submitted, equitable relief was no longer necessary.

Plaintiff further requested that he be permitted to amend his complaint for the purpose of requesting a jury trial, which was not requested at the time the original complaint was filed.

Defendant filed a motion to strike plaintiff's motion for leave to amend and supplement the complaint.

This court entered a memorandum order on September 12, 1972, granting plaintiff's motion to amend and supplement his complaint for the purpose of changing the form of relief requested and denying plaintiff's motion with respect to his request for a jury trial.

A non-jury trial was conducted on September 25 and 26, 1972, at which evidence relevant to plaintiff's averments of discriminatory treatment was adduced. Plaintiff's allegations of discrimination are basically threefold.

1. He contends he was discriminatorily disciplined and discharged.

2. He alleges he was continuously harassed by employees and supervisory personnel of United States Steel due to his national origin and that its failure to protect him from these acts constitutes discrimination.

3. Plaintiff avers that he suffers from numerous allergies and has peribronchial fibrosis of the lungs, as a result of which he is abnormally sensitive to inhalants. He alleges that as a result of defendant's discriminatory refusal to assign him to an area where he would not be subjected to excessive noxious odors to which he was allergic, his physical condition deteriorated resulting in inability to work.

This court having duly considered the evidence, the trial briefs and oral arguments of counsel, and the post trial requests for findings of fact and conclusions of law, now makes the following findings of fact and conclusions of law based thereon.

## FINDINGS OF FACT

Plaintiff, Gyula Fekete, is a native-born Hungarian who came to the United States in 1956 as a refugee following the Hungarian revolution.

He commenced working for United States Steel's National Works located in McKeesport, Pennsylvania, as a machinist on November 5, 1964.

He was initially recompensed for his services at the starting rate for machinists. Upon successfully completing his probationary period he was promoted to the intermediate rate, and was given back pay retroactive to the date of his hire based on this intermediate classification.

Mr. Fekete did not advance to the machinist first-class rate because he twice failed the qualifying performance test.

The week before the first test plaintiff refused to avail himself of the opportunity offered to him by management to practice on and familiarize himself with the milling machine, which he would be required to operate during the test.

After he failed the second time, machine shop general foreman George Sucha offered to help him learn how to cut the gear, one of the tasks required to be performed during the examination which plaintiff had not mastered, to permit him to pass the test on his third try. Plaintiff did not take advantage of this offer nor did he request to take the test a third time.

Subsequent to the successful completion of his probation period and throughout his employment, plaintiff's supervisors experienced difficulty working with and supervising him. He resented authority, argued with his supervisors when they attempted to instruct and correct him, and occasionally disregarded their orders.

On one occasion plaintiff broke a drill holder because he failed to follow the instructions which foreman Frank Kuczler had just given to him. Observing plaintiff attempting to start a hole with a flat-bottom drill, foreman Kuczler instructed him to use another drill to reach the desired depth and then to use the flat-bottom drill to square out the bottom of the hole. Plaintiff disregarded his orders and attempted to use the flat-bottom drill to initiate the hole, causing the drill holder to break.

We do not credit plaintiff's allegation that he was discriminatorily disciplined because he was sent home for breaking the drill, whereas another worker was not disciplined for breaking a 3-inch boring bar. On cross-examination plaintiff admitted he did not see another worker break the 3-inch boring bar or have any knowledge about the occur-rence; he had merely found a broken boring bar.

Plaintiff was derelict with respect to his duties on other occasions as well. He was given a one-day suspension for scratching the surface of a work assignment, which he did not protest because he felt it was his fault. He was returned to the machine shop after being unsuccessfully transferred to the armature shop on a trial basis because he was not working productively and was complaining about his environment. He was frequently absent from his job area when he was assigned to the power plant for a week.

Plaintiff disregarded the company safety rules on occasion. One time a small punch made out of steel wool, which plaintiff was using in violation of the safety rules, was taken from him. Another time a file without a handle was confiscated. Throughout his employment in the machine shop, plaintiff persisted in using compressed air indiscriminately.

On October 13, 1967, plaintiff received a five-day suspension which was converted to a discharge on October 21, 1967 for "repeated substandard work performance, continual violation of safety rules, improper maintenance of machine tools, use of file with no handle deburring rotating work." Plaintiff filed a grievance on October 25, 1967 and was subsequently reinstated with full back pay on July 18, 1968 as a result of a labor award. The decision was based upon the fact that Mr. Fekete had not been sufficiently warned that past derelictions in his work would be considered in later disciplinary proceedings.

We find no merit in plaintiff's allegations that the company threatened to black list him while arbitration proceedings related to his discharge were pending. Rather, we find that Mr. Stevens, superintendent of the shops service, offered to convert Mr. Fekete's discharge to a resignation during the fourth step of the grievance procedure so that plaintiff's discharge would not be on defend-

ant's records and plaintiff could more easily obtain a job elsewhere.

While arbitration proceedings were pending, plaintiff filed a charge with the Equal Employment Opportunity Commission on January 12, 1968. The Equal Employment Opportunity Commission referred the charge to the Pennsylvania State Human Relations Commission, which found on May 1, 1968 that no probable cause existed for crediting plaintiff's allegations of discrimination. Likewise, on September 30, 1968, the Equal Employment Opportunity Commission found reasonable cause did not exist to believe respondent was in violation of Title VII of the Civil Rights Act of 1964.

After reinstatement in August of 1968, plaintiff worked for United States Steel until October of 1969, at which time he left work for alleged health reasons. To this date he has not returned to work at United States Steel, or worked or attempted to work elsewhere. He received sick benefits for one year and is presently living on social security.

Plaintiff was extremely sensitive to drafts and odors and this adversely affected his job performance and his relationship with his supervisors and co-workers in that he constantly complained about his working environment.

In 1965 plaintiff complained about drafts in the machine shop, indicating that such drafts irritated his ears. George Sucha, general foreman of the machine shop, issued a winter helmet to him to protect his ears, which plaintiff proceeded to wear all the time, both summer and winter, and which alleviated his problem with drafts.

After plaintiff had been working in the machine shop approximately three years, he began complaining about odors emanating from the garbage can located approximately 20 to 25 feet from his machine, which had been in place since 1958 or 1959. Although no one else had complained about the smell, the company responded by emptying the cans more often and steam cleaning them.

Plaintiff was sensitive to other odors in the plant environment as well. On one occasion his foreman, Mr. Kuczler, encountered him bailing water out of his machine and emptying it into another machine because the water smelled. When the foreman indicated to him that the water would smell for the man who operated the machine into which he was putting the water, Mr. Fekete walked away. A laborer later indicated to Mr. Kuczler that he had cleaned out Mr. Fekete's machine the night before and that the odor of the deodorant pellets must have been the smell that irritated Mr. Fekete.

Although plaintiff never filed a formal transfer request, the company transferred him to several different areas of the plant in an attempt to accommodate his sensitivity to the environment.

He was temporarily transferred to the power plant area to fill the position of a man on vacation. Even though large fans change the air in the boiler room every 60 seconds to prevent the accumulation of gas in the area, plaintiff was frequently absent from his job area for a 2-day period because the odors in the shop irritated him. He finally was instructed to either return to work or go home.

He was returned to the machine shop after being transferred unsuccessfully to the armature shop on a trial basis, because he was unproductive and was complaining about the working environment.

Plaintiff did find conditions in the pipe shop to which he was temporarily transferred for 8 weeks, beginning in December of 1966, to fill the position of an employee on vacation to be excellent. The pipe shop is located in an open area shielded by sheet iron. It is by plaintiff's admission a smoky, smelly, drafty, cold place. We find the environment in the pipe shop to have been much less favorable than in the machine shop.

Plaintiff dwelled more and more on the environment after his reinstatement. Although he was returned to the same machine and handled the same flow of

work as previously, he began complaining about the oils. He was moved to another area, at which time he began complaining about cleaning fluids and detergents. He admitted he had used cleaning fluids throughout his employment and that many other workers in the machine shop worked with these fluids as well. No other worker had lodged complaints with the company with respect to the smell associated with such work.

While waiting for his grievance to be arbitrated, plaintiff worked in a welding shop for a month and a half. He subsequently quit because he could not tolerate the odorous, smoky conditions which existed in that working environment.

During the course of plaintiff's employment, the company caused plaintiff to be examined from time to time by company physicians. These doctors indicated nothing was wrong with plaintiff which would prevent him from working in the shop environment.

Although plaintiff caused himself to be examined by 15 or more doctors located in the Pittsburgh area, he was not satisfied with their treatment or diagnosis of his ailment and none were called to be witnesses in his behalf. The only doctor plaintiff felt satisfied with was a Canadian physician, Dr. S. I. Feuer, who was not called to be a witness.

To substantiate his claim that exposure to inhalants caused his physical deterioration resulting in inability to work, plaintiff submitted a chest x-ray report from Dr. S. H. Barnard dated November 10, 1967, which states he has peribronchial fibrosis on both sides; a letter dated December 22, 1971 from Dr. José E. Chaves Foglia, a Costa Rican doctor, indicating plaintiff has peribronchial fibrosis located in both pulmonary apeces which could be caused by contamination at the place of work; a copy of a note dated September 28, 1968, written on a prescription pad by S. I. Feuer, M.D., recommending Mr. Fekete be allowed to work in a place where he would not be in contact with various inhalants which could cause him asthmatic problems; and a copy of a McKeesport hospital clinic record setting forth bronchial sensitivity as a provisional diagnosis on April 8, 1968. No Final diagnosis was indicated on the record.

Plaintiff submitted two lengthy reports from Norbert S. Weikers, M.D., and C. L. Anderson, M.D., indicating they found no evidence of physical disease in Mr. Fekete.

No competent evidence has been introduced from which this court could possibly make findings as to the nature and causation of plaintiff's illness.

A number of the administrative and advisory personnel with whom plaintiff came into contact during the pendency of his employment at United States Steel's National Works were of various recent ethnic origin. The individual who initially interviewed the plaintiff for employment, Mr. Tony Tubis, chief interviewer in the personnel department, is of Hungarian origin. The parents of assistant superintendent of shops and methods, Walter Frankola, immigrated from the Peninsula of Istria. The general foreman of the machine shop, George Sucha, is a Czechoslovakian. One of the plaintiff's foremen, Frank Kuczler, is a second-generation Hungarian who speaks Hungarian fluently. Another foreman for whom plaintiff worked, Albert Nesteruk, had parents who immigrated from Poland and Russia.

Approximately 50% of the 130 employees in the machine shop, where plaintiff was employed, were of various recent ethnic origin. Of this number, 10 to 13 were of Hungarian ancestry. Four or 5 employees were second-generation Hungarians who were able to speak Hungarian. Although Mr. Fekete was the only native-born Hungarian in the machine shop, 5 other Hungarian refugees had been hired in the course of years by the National Works. These men were hired without having to produce the customary birth certificate and high school diploma.

To facilitate communication with plaintiff when he commenced working for United States Steel, machine shop general foreman George Sucha requested foreman Frank Kuczler to speak to plaintiff in Hungarian. Plaintiff later indicated to Mr. Sucha that he no longer desired to speak Hungarian, and communication in Hungarian was discontinued.

In the fall of 1965 an incident occurred when an American flag was placed on plaintiff's machine by an unknown person or persons while plaintiff was away from his machine during the lunch hour. Finding the flag stuck in his machine upon his return upset plaintiff and he threw it on the ground. Foreman Nesteruk was approaching plaintiff's machine at the time and saw the occurrence. He retrieved the flag and inquired why plaintiff had thrown it. Plaintiff responded that he was taking medication and didn't know what he was doing. Further issue was not made of the matter at that time.

Later the same day foreman Nesteruk again questioned plaintiff about the incident. At plaintiff's request he then attempted unsuccessfully to ascertain who had placed the flag in plaintiff's machine. No one would admit putting the flag there. The workers questioned did indicate to Mr. Nesteruk that they felt he had been too lenient and that he should have sent plaintiff home.

Two days later foreman Nesteruk told plaintiff that although he did not want to make a political or patriotic issue out of this incident, he was obliged to issue him a disciplinary slip for violation of a company safety rule which prohibits throwing objects on plant premises. The white slip the foreman intended to issue would go into plaintiff's file and would indicate that plaintiff had thrown the American flag in the machine shop.

Upon being told he was to receive a disciplinary slip, plaintiff broke into a sweat, then collapsed and appeared to experience an epileptic fit. He was taken by company ambulance to the plant hospital. He then received medical treatment at the McKeesport Hospital and was off work 2 weeks.

While Mr. Fekete was off work, the general foreman of the machine shop, George Sucha, investigated the incident in an attempt to ascertain who had placed the flag on plaintiff's machine. He did not find out who had put the flag there but he did find out that plaintiff had alienated the workers around him, 2 of whom were Hungarians, by making remarks denigrating the United States. To protect plaintiff from further harassment, Mr. Sucha moved plaintiff to an area close to his office upon his return to work following the incident.

General foreman Sucha also made an offer, in the presence of plaintiff and the union grievance man, Richard Grace, to tear up and discard all records in plaintiff's file pertaining to the flag incident. Although the union was willing to accept this offer as a satisfactory settlement of the complaint, plaintiff insisted that all records of the occurrence be given to him, which the company was unwilling to do.

The aforementioned flag incident occurred more than 90 days before plaintiff filed his charge under Title VII with the Equal Employment Opportunity Commission on January 12, 1968.

On another occasion plaintiff discovered a newspaper clipping on the company bulletin board which portrayed 2 chimpanzees hugging each other and bore the caption "Reunion of the Hungarian Refugees." He did not know who had placed the clipping on the bulletin board or how long it had been there. He first noticed its existence when another worker called his attention to it, at which time he removed it.

Plaintiff did not bring this incident to the attention of management.

Testimony established that material to be placed on company bulletin boards has to be approved by the personnel department before it could be posted and that a cartoon of the type described by plaintiff would not have received ap-

proval, although the company had no knowledge concerning this particular incident. It was admitted that unauthorized material is occasionally posted on the boards by unknown persons but such material is removed when discovered by management.

The date of this occurrence was not indicated by the testimony, although plaintiff's pretrial narrative indicates it occurred during the early part of plaintiff's employment.

Another time, unknown workers painted the image of a device on the wall of the restroom and captioned it "Newest Hungarian Invention About the World-Destroying Device." Although plaintiff did not bring it to the attention of management, it was painted over in approximately 1 week.

Testimony established that although management did not inspect the restrooms on a daily basis, it is the policy of the company to paint over graffiti when they are aware of its presence.

Testimony further established that ethnic jokes are commonly placed on the restroom walls and that management inspects the washrooms on a monthly basis to detect such inscriptions for the purpose of having them eradicated.

No evidence regarding the approximate date of this occurrence was presented.

The year-round wearing by plaintiff of a protective helmet intended to be worn outdoors in the winter was most unusual, attracting attention to Mr. Fekete in a negative sense and causing pranks to be directed against him. On one occasion unknown workers directed a fan toward plaintiff. On another occasion during the winter, a window close to his machine was opened by unknown workers.

When the foreman, Mr. Challinor, was unable to ascertain who had opened the window, he told the men that the heat would be turned off in the shop if the window was not closed in 2 minutes, and it was shut when he returned in 2 minutes. He further instructed the men at the next safety meeting that he didn't want any horseplay or harassment of anyone on the crew.

Plaintiff was issued a reprimand for "horseplay" when he opened a window while other workers were not disciplined for the same act because plaintiff was caught, whereas the other workers were not.

No evidence regarding the dates of these incidents was presented.

Approximately 4 times in 1967 unknown workers wrote "Hunky Go Home" on plaintiff's tool box in chalk.

We do not find that plaintiff reported this incident to a foreman who indicated plaintiff should go home if he did not like it. This response would not be in conformity with management's behavior on other occasions when plaintiff complained, which was to attempt to accommodate him and to prevent other workers from harassing him. We note that plaintiff was unable to remember the foreman's name or otherwise identify him. Additionally, this allegation was made during cross-examination in response to defendant's question regarding whether plaintiff had brought this incident to the attention of management. Plaintiff did not mention this relevant occurrence when he presented his case.

Plaintiff alleges another incident occurred after his reinstatement. He avers that one day he had left his job station in the power plant because there was a great deal of chemical dust in the area and he was waiting outside until it settled, when a foreman, whom he later identified to be Robert Challinor on redirect, forced him to return to the area, calling him a "dumb hunky" and making such statements as "I am going to run over you and I'm going to make sure you come back here and die here."

Foreman Challinor denies ever calling plaintiff a hunky or other derogatory term.

Having observed the demeanor of both Mr. Fekete and Mr. Challinor and having scrutinized their testimony in its entirety, we do not find that Mr. Challi-

nor called plaintiff a hunky in this context. Although derogatory terms connotating a race or national origin are often utilized in jest in a melting pot environment such as this, normally such terms are not used in anger. Although we can well believe that Mr. Challinor may have been disturbed at Mr. Fekete for discontinuing his work and leaving his job site, we do not believe he called Mr. Fekete a hunky in a disparaging manner in front of many workers of recent foreign ancestry who would be incensed by such usage.

## CONCLUSIONS OF LAW

The court has jurisdiction of this action and the parties under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e–5(f).

United States Steel Corporation is an "employer" within the meaning of Title VII of the Civil Rights Act of 1964.

■ Although a number of the incidents alleged to be discriminatory were not shown to have occurred within the statutory period, which in this case would be 90 days prior to the date plaintiff filed his grievance, Hutchings v. United States Industries, Inc., 428 F.2d 303 (5th Cir. 1970); Malone v. North American Rockwell Corp., 457 F.2d 779 (9th Cir. 1972); we find that plaintiff has sufficiently alleged the existence of a pattern of· discrimination occurring throughout the course of his employment to require us to consider these incidents on the merits.

While it is evident that plaintiff is very much troubled and we sympathize with ˙him, we do not find that he has been discriminated against by defendant due to his national origin in violation of Title VII of the Civil Rights Act of 1964.

■ Plaintiff was not discharged due to his national origin but because he had a poor work record, had violated the company safety rules, and because he was argumentative concerning supervisory instruction and often disregarded it.

■ Nor do we find plaintiff was discriminatorily disciplined. Plaintiff effectively discredited by his own testimony his allegation that he had been sent home for breaking a drill handle, whereas another worker was not disciplined for breaking a 3-inch boring bar. Plaintiff had no idea who had broken the boring bar, under what circumstances it was broken, or even if the individual responsible had in fact been the subject of disciplinary action. There was certainly nothing improper about sending plaintiff home for breaking a piece of equipment caused by his deliberate disregard of supervisory instruction.

Plaintiff received a disciplinary slip for the flag incident because he had broken a company safety rule. A disciplinary slip was not given to other workers for placing the flag on plaintiff's machine because neither the day foreman Albert Nesteruk nor the general foreman of the machine shop George Sucha were able to ascertain after investigation who was responsible for putting it there.

Furthermore, the company was willing to dispose of all documents concerning the episode, thereby fully eradicating plaintiff's record with respect to this incident. However, plaintiff refused this offer and demanded instead that all relevant papers be given to him.

Plaintiff received a disciplinary slip for improperly opening a window because he was caught. Other workers who had opened a window on a prior occasion to harass plaintiff were not identified and therefore could not be given a slip. The workers were told, however, that the heat would be turned off in the plant if the window was not closed immediately, and they were instructed at the next safety meeting to refrain from horseplay or harassment of anyone on the crew.

We do not find that plaintiff's exposure to the fumes, inhalants, and oils of the plant environment or the requirement that he work with cleaning fluids and detergents was discriminatory.

Plaintiff was treated no differently than any of the other employees in the machine shop, armature shop, power plant and pipe shop. All were exposed to the same environment and many of the machine shop employees worked with cleaning fluids as plaintiff has done throughout his employment.

We note that during the course of plaintiff's employment the company received no credible medical diagnosis indicating that the plant environment created or exacerbated any physical ailment in plaintiff, although plaintiff was examined by company physicians and 15 or more local physicians of his own choosing.[1]

We further note the fact that plaintiff found conditions in the pipe shop to be excellent somewhat contradicts his position that the machine shop environment made him ill, as we found conditions in the pipe shop to be generally less favorable than that in the machine shop.

We do not believe the harassment directed against plaintiff was motivated by his national origin. The ethnic composition of the machine shop itself makes it appear unlikely that an individual would be harassed because he was a Hungarian. Fifty percent of the 130 employees in the machine shop were of various ethnic origins. Of this number, 10 to 13 were Hungarian and 4 or 5 could speak Hungarian.

The facts adduced at trial suggest there may have been other reasons for these incidents. Plaintiff was argumentative and a constant complainer. He often would not work in an environment in which the other workers had to function. He attracted negative attention to himself by wearing inside year-round a protective helmet designed to be worn outdoors in the winter. He made derogatory remarks about the United States, which caused a great deal of resentment on the part of other workers. He emp-

tied water from his machine which smelled into the machine of another worker.

■ The fact that an individual is harassed occasionally because he is unconventional and unduly sensitive or a hypochondriac, or because he does not have a sense of humor, or because people do not like him is not cognizable under the Civil Rights Act and does not constitute a matter of inquiry before this court.

■ Even if this harassment had been motivated by plaintiff's national origin, which we find it was not, we do not think United States Steel can be held accountable for the unauthorized acts of its workers in this case.

We are not confronted with a situation in which an individual was subjected to a concerted pattern of harassment by workers which the company knew about and did not attempt to stop. In the case now before us, plaintiff was the object of a few isolated instances of harassment over a 5-year period, about which United States Steel's administrative and supervisory personnel did not always know but which they took steps to prevent and correct when they were informed.

Machine shop general foreman George Sucha moved plaintiff to a machine close to his office to protect him from further harassment when his investigation of the flag incident revealed that plaintiff had alienated workers around him, 2 of whom were Hungarians.

Management took no steps with reference to the chimpanzee clipping placed on the bulletin board because it was not aware that this incident had occurred. Plaintiff admitted he did not bring this occurrence to management's attention.

We note that this incident occurred in violation of a company rule which requires that material be approved by the

---

1. A 1-sentence handwritten note from a Canadian physician indicating that plaintiff should be allowed to work in a place where he would not be in contact with various inhalants which would cause him asthmatic problems can hardly be considered credible medical information upon which the company could rely and act.

personnel department before it is posted on company bulletin boards. This clipping was not approved and would have been removed had it been discovered by management.

Writing or drawing on washroom walls is also prohibited, and it is company policy to paint over graffiti when they are aware of its presence. Although plaintiff admitted he did not inform management about the markings on the washroom wall which he thought referred to him, he admitted it was painted over within a week.

When a window was opened near plaintiff's machine with an apparent intent to irritate plaintiff, foreman Challinor told workers in the shop that the heat would be turned off in 2 minutes unless the window was closed. He instructed the men at the next safety meeting that he did not want any horseplay or harassment of anyone on the crew.

No evidence has been introduced which convinces us that plaintiff's supervisor knew about the writing on the tool box and took no steps to prevent a reoccurrence of the incident. We note that the writing only appeared 4 times and that the medium used was chalk so that the words could be and were easily erased.

Not only do we find plaintiff was not discriminated against by United States Steel but we further find that the company went to considerable lengths to help and accommodate him. He was hired without having to produce his birth certificate and his high school diploma, which all applicants are required to furnish.

To facilitate communication with plaintiff when he began working at United States Steel, machine shop general foreman George Sucha requested foreman Frank Kuczler, a second-generation Hungarian, to speak to him in Hungarian because he was having difficulty with his English.

Plaintiff was given an opportunity to practice on the milling machine before he took the performance test to qualify for advancement to the machinist first-class rate, which he refused. Machine shop general foreman George Sucha offered to teach plaintiff how to cut the gear so he could pass the qualifying performance test which he had twice failed. Plaintiff did not take advantage of this offer.

Plaintiff was moved to a number of different areas in the plant in an attempt to accommodate his sensitivity to the smells and inhalants and his general dissatisfaction with his environment, and to protect him from the harassment of his coworkers. He was given a protective helmet to protect his head from drafts. The garbage cans were emptied more often and steam cleaned because of plaintiff's complaints about their smell.

Therefore, in accordance with the above findings of fact and conclusions of law, an appropriate order will be entered.