Federico EREBIA, Plaintiff-Appellee,

v.

CHRYSLER PLASTIC PRODUCTS CORPORATION,
Defendant-Appellant.

No. 84–3291.

United States Court of Appeals,
Sixth Circuit.

Argued March 7, 1985.

Decided June 7, 1985.

Rehearing and Rehearing En Banc
Denied Sept. 10, 1985.

Cornelia G. Kennedy, Circuit Judge, filed a dissenting opinion.

PHILLIPS, Senior Circuit Judge.

This case involves a claim under 42 U.S.C. § 1981[1] alleging that defendant-appellant Chrysler Plastic Products Corporation was responsible for a hostile work environment where plaintiff-appellee Federico Erebia was subjected to ethnic slurs. The case was tried to a jury on January 10–12, 1984, in the Northern District of Ohio, Judge John W. Potter presiding. The jury returned a verdict in favor of plaintiff, awarding $10,000 in compensatory damages and $30,000 in punitive damages. Defendant appeals.

## I

Plaintiff, a Mexican-American, brought this action in conjunction with claims alleging discrimination in layoffs, recalls, and denial of shift changes. The issue of recalls was tried before the court and jury under § 1981 and Title VII, 42 U.S.C. §§ 2000e–2000e–17. At the close of all the evidence, the court granted Chrysler's motion for a directed verdict on the issues of shift changes, layoffs, and recalls. The court found in favor of Chrysler on the Title VII claim. The court denied defendant's motion with respect to the hostile work environment claim, finding there was sufficient evidence to present to the jury.

The hostile work environment claim then was presented to the jury. Chrysler objected to the court's rejection of proposed jury instructions concerning plaintiff's participation in or incitement of ethnic slurs. The court denied the objection, finding the subject matter appropriate for closing argument rather than jury instructions. Following the jury verdict, the court denied defendant's motion for judgment notwithstanding the verdict in an order dated March 9, 1984.

Kathleen Maher Zouhary (argued), Mary Ann Whipple, Fuller & Henry, Toledo, Ohio, for defendant-appellant.

Dennis E. Murray (argued), Murray & Murray Co., Kirk J. Delli Bovi, Sandusky, Ohio, for plaintiff-appellee.

Before KENNEDY and MILBURN, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

1. Title 42 U.S.C. § 1981 provides:
 All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

Plaintiff Erebia testified in his own behalf and was his only witness. He testified he had lived in Mexico from age two until twenty-two, returning to the United States in 1957. His parents were Mexican. He had been employed by Chrysler Plastic Products Corporation for eighteen years beginning November 8, 1965. At the time of trial he was an Inspection Supervisor. During much of his employment he has worked in the evenings as a supervisor in the calendar department, where ingredients are rolled into a film for production. He testified that he had worked in other departments as well.

Due to the statute of limitations period, plaintiff testified only to events occurring after February 3, 1977. He testified that after this date he had many problems with hourly employees. He testified that an hourly employee, Rolland Forney, who had a mailman classification, "kept calling me names, and it got to the point where, you know, you can only take so much. They're going to have to start answering because I have never got any backing from the company as far as for discipline." (T. 53). Erebia was called "a wet bag [sic], tomato picker." (T. 54). Plaintiff testified that Rolland Forney refused to follow his instructions "everyday ... on a daily basis" from 1977 until 1980 when Forney was laid off. Forney would refuse to follow instructions, as he told plaintiff, because "I was Mexican and he was white." (Id.).

Plaintiff referred to Marv Keegan, a production superintendent, as "my boss." (T. 48). Plaintiff complained to Keegan about the situation on virtually a daily basis. (T. 55). Keegan did nothing in response except to advise Erebia to "build up a case." (T. 54, 55).

Plaintiff testified that an hourly employee in the laminating department under his supervision, Wilbur Wood, also directed racial slurs at him. Plaintiff stated: "He mainly told me to go back to Mexico, there was some white person that could be doing my job instead of a Mexican." (T. 55). Wood refused to follow plaintiff's directions almost every day from April of 1980 to the end of July the same year, when Erebia was laid off. (T. 56).

Plaintiff stated that he constantly kept seeing his boss, Keegan, about the problem and approached the general foreman, Jim Lilje, as well. (Id.) The managers did nothing in response. (T. 57). Erebia discussed the problems on two occasions with personnel manager Jack Lenz. Plaintiff testified: "His advice was that I was a hot headed Mexican, that I should put a deaf ear to it, that it was nothing but shop talk to me." (Id.) Plaintiff replied that "everybody was just too much to be ignored." (T. 57–58).

At a second meeting with Lenz in the summer of 1977, plaintiff explained that the employees refused to abide by his instructions and abused him constantly. (T. 260). He was told that he should take the slurs and abuse "like nothing." (Id.) Erebia was "highly upset" about the abuses and failure to follow instructions and the poor backing of management. (T. 259). He criticized management. Lenz became upset and made the statement, "I'll hurt you economically." (T. 58, 260).

On cross-examination, Erebia admitted that he engaged in "shop talk" and that it was common in his employment to use profanity. (T. 82). He also admitted that he had called an hourly employee a "gringo" after the employee had called him a "wet back." (T. 82–83). Plaintiff admitted that he had, in December of 1977, told the husband of a plant worker, a Mr. Baum, that he should go back to Germany and he was a "queer communist." (T. 83–84).

Plaintiff testified that "shop talk" is an exchange that is acceptable to both parties involved and would not encompass coversations to which someone objects. (T. 91). He testified that he had not used any slurs where anyone objected. (Id.) He stated that he knew of no cases other than his own where racial slurs were directed to supervisors by hourly employees. (Id.)

The defense did not call as witnesses any of the individuals plaintiff said had slurred him. Nor did it call any of the management employees plaintiff testified had

failed to respond to his complaints. Instead, it called Chester R. Ferguson, the labor relations and hourly employment supervisor at the Sandusky plant. Plaintiff had testified that he understood the policy on reporting racial slurs required him to report first to his immediate supervisor, the general foreman. The foreman in turn, relays the complaint to the superintendent or supervisor, who finally reports it to Ferguson. (T. 68). Plaintiff testified that he was never instructed to give a racial slur complaint to Ferguson. (Id.)

Ferguson was responsible for disciplinary and grievance procedures. He was assigned additional functions after the major layoffs in 1979 and 1980. (T. 114). Ferguson had the responsibility of investigating whether violations of plant rules had occurred and could authorize any disciplinary measures requested by supervisors and lower management. (T. 148, 186). Ferguson testified that Erebia did not complain to him about the ethnic slurs to which he was subjected. Nor did plaintiff's supervisors make him aware of the verbal abuse reported by plaintiff. (T. 148).

Although Ferguson was unable to give specifics, he testified that he had received complaints by hourly employees of general verbal abuse by Erebia. (T. 149–51). He testified that the union had pressed a complaint regarding the incident where plaintiff made abusive statements to Baum, a white individual and the husband of a plant employee. (T. 190). He regarded this as a racial slur. (T. 150–51, 190). In that case, management through Ferguson investigated the complaint. The incident was resolved as an exchange and the parties were admonished "to conduct themselves in a better businesslike manner." (T. 151). As noted earlier, no such investigation or measures were taken with regard to plaintiff's complaints.

A former union representative at the plant, James Hackworth, testified that an hourly employee, Larry Torres, Jr., had complained of an argument with Erebia in 1977 in which curses were used. (T. 194–95). The incident was resolved informally on the plant floor. (T. 196). Erebia stressed that no slurs were exchanged in that incident. (T. 266).

## II

We turn first to appellant Chrysler's contention that there was insufficient evidence to support the jury's verdict that Chrysler intentionally discriminated against plaintiff by maintaining a discriminatory working environment. The cause of action for hostile work environment was first recognized in Rogers v. EEOC, 454 F.2d 234 (5th Cir. 1971), cert. denied, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972). That case, like many cases following it, was decided under Section 703 of Title VII, 42 U.S.C. § 2000e–2(a), which makes it unlawful to discriminate with respect to terms, conditions, or privileges of employment.

Although Title VII clearly applies to national origin discrimination, section 1981 is not so specific. Appellant has not maintained, however, that section 1981 does not cover the charges Erebia has brought in this case. Although courts have had some difficulty with cases alleging only national origin discrimination under section 1981, where there are allegations that discrimination against Hispanics is of a racial character a cause of action under section 1981 has been recognized. See Gonzalez v. Standford Applied Engineering, Inc., 597 F.2d 1298, 1300 (9th Cir.1979) (per curiam) (dismissal of section 1981 claim brought by a Mexican-American was improper because "prejudice towards those of Mexican descent having a skin color not characteristically Caucasian must be said to be racial prejudice under § 1981"); Manzanares v. Safeway Stores, Inc., 593 F.2d 968, 971 (10th Cir.1979) (reversing dismissal of a section 1981 action brought by a Mexican-American and holding that racial discrimination is not to be limited to the technical or restrictive meaning); Ortiz v. Bank of America, 547 F.Supp. 550 (E.D.Cal.1982); Pollard v. City of Hartford, 539 F.Supp. 1156, 1165 (D.Conn.1982); Madrigal v. Certainteed Corp., 508 F.Supp. 310 (W.D.Mo. 1981); Aponte v. National Steel Service

*Center,* 500 F.Supp. 198, 202–03 (N.D.Ill. 1980); *LaFore v. Emblem Tape and Label Co.,* 448 F.Supp. 824 (D.Colo.1978). In the present case section 1981 clearly applies because the slurs Erebia testified about were of a racial character. Erebia reported statements such as "I was Mexican and he was white" (T. 54) and "some white person could be doing my job instead of a Mexican," (T. 55).

In *Rogers v. EEOC, supra,* 454 F.2d 234, 238 (5th Cir.1971), *cert. denied,* 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972), Judge Goldberg held that an employee of Spanish origin surnamed American had a cause of action against an employer for "the practice of creating a working environment heavily charged with ethnic or racial discrimination." He stressed that while the simple utterance of a racial epithet would be insufficient to assert a cause of action, an action under Title VII would lie where a working environment is "so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group members." *Id.*

Courts addressing claims of hostile working environment have emphasized that incidents of racial slurs must be more than sporadic and that the plaintiff must demonstrate that management failed to take adequate steps to remedy the situation. *See generally, Bundy v. Jackson,* 641 F.2d 934, 943–44 (D.C.Cir.1981). In *Cariddi v. Kansas City Chiefs Football Club, Inc.,* 568 F.2d 87 (8th Cir.1977) (per curiam), the court found that the use of ethnic slurs by a supervisor did not amount to a violation of Title VII. The plaintiff, a former employee hired to supervise ticket takers, sued for damages for a stadium director's references to him as a "dago" and other Italian-American employees as "mafia." The trial court found that the comments were part of casual conversation and were not so numerous as to rise to a Title VII violation. *Id.* at 88. The Eighth Circuit affirmed, holding the findings were not clearly erroneous. The court did not find it necessary, therefore, to address the claim under section 1981. *Id.*

The Eighth Circuit addressed the issue again in *Johnson v. Bunny Bread Co.,* 646 F.2d 1250 (8th Cir.1981). There two black plaintiffs brought suit under Title VII and section 1981 for discriminatory work practices including hostile work environment. The court noted: "Unquestionably, a working environment dominated by racial slurs constitutes a violation of Title VII." *Id.* at 1257. Noting that a claim for hostile work environment depends on the degree of harassment, *id.,* the court considered the evidence found by the court not to violate Title VII. The court observed that the evidence conflicted sharply. While the plaintiffs testified that supervisors and fellow employees often referred to them as "niggers," the plant manager stated that he never heard such references and would have reprimanded those responsible. There was testimony by other employees corroborating each side. *Id.* The court held that the use of racial slurs, *if any,* "was infrequent, was limited to casual conversation among employees, and with possible rare exceptions was not directed toward appellants." *Id.* The court contrasted the circumstances in *EEOC v. Murphy Motor Freight Lines, Inc.,* 488 F.Supp. 381, 384 (D.Minn.1980) where the use of slurs and the incidence of harrassment were more frequent and the plaintiff prevailed. The court noted the resolution under Title VII was dispositive of the section 1981 claim as well. 646 F.2d at 1252 n. 1.

Another case upon which appellant relies is *Vaughn v. Pool Offshore Co.,* 683 F.2d 922 (5th Cir.1982). There the plaintiff, a black offshore oil rig roustabout, brought a section 1981 and Title VII claim against his former employer alleging discrimination in a "racially charged employment atmosphere" that caused him to resign. The district court in a bench trial found for the defendant and the Fifth Circuit affirmed. The court found that life on the oil rig was rough and rowdy, with frequent pranks, practical jokes, and verbal abuse. *Id.* at 923. The plaintiff was referred to by other employees as "nigger," "coon" and "black boy," but joined in "similar opprobrium"

himself which the record showed "were bandied back and forth without apparent hostility or racial animus." *Id.* at 924. The court emphasized that relations between the plaintiff and fellow employees were friendly and cordial. *Id.* The court recited two incidents where the plaintiff was exposed to racial slurs that were more serious. In one, an independent crane operator directed racial slurs at the plaintiff in an angry tone after the plaintiff was almost struck by the crane load. The head employee, however, immediately responded, evidenced his displeasure and took the matter up with the operator's foreman. *Id.* In the second incident, a racial slur and stereotype arose during a television news report. The head employee, the Toolpusher, again immediately admonished the men responsible that "they should have some respect for [the plaintiff]." *Id.*

The court held that the finding of no malicious or inordinate racial slur usage was not clearly erroneous. *Id.* at 925. It stressed that all employees were subject to the same pranks and that plaintiff himself did not believe he was singled out for treatment. *Id.* The court emphasized that the plaintiff's perception of the environment is a "significant factor" because a determination whether discrimination exists is a subjective inquiry. *Id.* The court also rejected the plaintiff's constructive discharge claim. *Id.* at 926–27.

Other courts have emphasized management's response to complaints, viewing it as an important element in a hostile work environment. In *Bell v. St. Regis Paper Co.,* 425 F.Supp. 1126 (N.D.Ohio 1976), Judge Leroy J. Contie, Jr., then a District Judge, denied relief on a hostile work environment claim under Title VII and section 1981. The court noted that "an employer covered by the terms of Title VII may be legally responsible for the acts of harassment of its employees merely by condoning them." *Id.* at 1137. Stressing that management had responded quickly to each claim of harassment, meeting with the employees concerned, warning them of penalties for harassment, investigating the charges, and hiring an outside consultant

to consider the allegations, the court held that management's actions had not condoned or permitted the harassment of the plaintiff. Similarly, in *Howard v. National Cash Register,* 388 F.Supp. 603 (S.D. Ohio 1975), the court denied relief on a harassment claim, finding that management had not failed to investigate complaints or proceed in a diligent manner and had disciplined an employee who used the word "nigger" in the presence of the plaintiff. *Id.* at 605. The court stressed that the plaintiff was not "subjected to a concerted pattern of harassment by workers which the company knew about and did not attempt to stop." *Id.* at 606 (quoting *Fekete v. United States Steel Corp.,* 353 F.Supp. 1177, 1186 (W.D.Pa.1973)). *See also Friend v. Leidinger,* 588 F.2d 61, 67 (4th Cir.1978) (findings of no harassment not clearly erroneous because the employer had taken disciplinary action against white officers and employees who harassed blacks and the incidents involved were isolated and contrary to the employer's policy); *Higgins v. Gates Rubber Co.,* 578 F.2d 281, 283 (10th Cir.1978) ("Absent a finding that Gates was or should have been aware of this unfavorable atmosphere, we cannot hold that the trial judge erred as a matter of law by not finding Gates in violation of the Civil Rights Act.").

In *DeGrace v. Rumsfeld,* 614 F.2d 796 (1st Cir.1980), a civilian employee of the Navy brought a Title VII action alleging that his discharge for failure to return to work was improper because his absence was caused by threats and harassment by other employees. The district court had found pervasive racism in the plaintiff's department, but denied punitive and compensatory damages because they were unavailable under Title VII. The First Circuit affirmed the district court's finding that the plaintiff's supervisors should have been aware of the offensive conduct—offensive and threatening notes left in the plaintiff's locker. The court held that the employer had an affirmative duty to correct the harassment: "An employer may not stand by and allow an employee to be subjected

to a course of racial harassment by co-workers, and thus defendants must accept responsibility for their supervisors' derelictions, if such existed, in responding to the racial problem at [the workplace]." *Id.* at 803 (citations omitted). The court emphasized that an employer who takes reasonable steps to correct and prevent racial harassment is not subject to liability. *Id.* at 805. The court remanded for proceedings on the reasonableness of the plaintiff's failure to return to work. *Id.* at 806.

In a case such as this where the trier of fact has found a hostile work environment and the employer's responsibility by its refusal to address the problem, the case comes to this Court in a different posture from a claim denied in the District Court. It is the function of the jury to consider credibility and other factors at play in plaintiff's claim. The jury determination will not be overturned lightly. Chrysler maintains that this case should be reversed merely because it arguably comes within the circumstances of cases upholding a denial of a claim on appeal under a clearly erroneous or substantial evidence review. Our task, however, is to determine whether the jury verdict is supported by substantial evidence. *See Anderson v. City of Bessemer City,* — U.S. —, —, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

In *Walker v. Ford Motor Co.,* 684 F.2d 1355 (11th Cir.1982), the court affirmed a district court's finding of liability under Title VII. The *Walker* plaintiff, while in a training program, was assigned to a dealership in Tampa, Florida. The plaintiff, a black male, complained to Ford and the dealership management about employees using racial epithets, referring to poorly-repaired cars as "nigger-rigged" and the employee with the lowest sales as the "black ass." *Id.* at 1358. An employee had called the plaintiff a "dumb nigger" and later apologized. There were other references to "niggers" in conversations about customers. The district court had awarded back pay because the plaintiff was discharged after incorrectly being reported absent, but denied compensatory and puni-

tive damages because they were not available under Title VII.

The Eleventh Circuit rejected Ford's contention that racial slurs were insufficiently pervasive to rise to a Title VII violation. The court observed that "an employer violates Title VII simply by creating or condoning an environment at the workplace which significantly and adversely affects [the psychological well-being of] an employee because of his race or ethnicity, regardless of any other tangible job detriment to the employee." *Id.* at 1358. The harassment "must be sufficiently pervasive as to alter the conditions of employment and create an abusive working environment." *Id.* (quoting *Henson v. City of Dundee,* 682 F.2d 897, 904 (11th Cir.1982)). The court upheld the district court's finding that the use of slurs was "repeated," "continuous" and "prolonged" despite the plaintiff's objections, emphasizing the finding was not clearly erroneous. 684 F.2d at 1359. The court found the requisite manager participation in a statement to the plaintiff by the Ford trainee manager that the slurs were "just something a black man would have to deal with in the South." *Id.* The court upheld the judgment for a Title VII violation and proceeded to affirm a finding of retaliatory discharge. The court affirmed the denial of compensatory and punitive damages, holding them unavailable under Title VII. *Id.* at 1363–64.

 In the present case, we find that the jury's verdict was supported by substantial evidence. Plaintiff's uncontested testimony was that he was subjected to slurs from February 1977 to July of 1982. His uncontested testimony was that he reported the slurs regularly during that period to three different managers who at best did nothing in response or, at worst called him a "hot-headed Mexican" or threatened him with economic harm. There is clearly substantial evidence on both the elements of repeated slurs and management's tolerance and condonation of the situation.

 Chrysler emphasizes that this action was brought under section 1981 and not

Title VII. A claim under section 1981 requires proof of intentional or purposeful discrimination. *General Building Contractors Association, Inc. v. Pennsylvania,* 458 U.S. 375, 391, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (1982); *Leonard v. City of Frankfort Electric and Water Plant,* 752 F.2d 189, 193 (6th Cir.1985). The district court charged the jury that to find for plaintiff it had to "find that the defendant intentionally or purposefully discriminated against plaintiff because he is a Mexican American." (T. 339). The court further required the jury to find "the failure or refusal to instruct plaintiff's subordinate co-workers to refrain from using racial slurs directed against plaintiff was intentionally based on plaintiff's race." (T. 341). The court noted that plaintiff claimed defendant violated section 1981 by intentionally treating him differently from white employees because of his race. (T. 340).

Chrysler asserts that the jury's verdict of intentional discrimination is not supported by substantial evidence because there was insufficient proof that management treated plaintiff differently from other supervisors. Chrysler relies heavily on *Smith v. Pan Am World Airways,* 706 F.2d 771 (6th Cir.1983) (per curiam). In *Smith* the plaintiff, a black female, had complained that a white male flight attendant had insulted her during a flight. Pan Am made diligent efforts to investigate, interviewed flight attendants including the individual involved, and arranged a hearing that the plaintiff refused to attend. The company learned, after the plaintiff filed a claim with the EEOC, that the plaintiff considered the incident sexual and racial harassment. The district court granted summary judgment to the employer on the section 1981 claim, finding the plaintiff did not provide the company the opportunity to resolve the problem, that the incident was an isolated occurrence, and that there was no indication the company had condoned the remarks in any way. *Id.* at 773. This Court affirmed, finding no evidence of racial animus on the part of Pan Am. Failure to discipline did not imply discrimination because the company was unaware of the nature of the complaint, thoroughly investigated the complaint, and did not depart from past practice of disciplining employees. *Id.* The Court held that the plaintiff did not present evidence as required that the company treated her differently from white employees and that disparate treatment was the result of a discriminatory purpose. *Id.* at 773–74 (citations omitted).

In *Leonard v. City of Frankfort Electric and Water Plant Board,* 752 F.2d 189 (6th Cir.1985), this Court reversed a summary judgment entered for the defendant Board on section 1981 and Title VII employment discrimination claims. The plaintiff, a black male, alleged he was subjected to a long course of harassment by supervisors and co-workers, leading to his discharge for throwing his headgear toward a supervisor in a gesture of frustration. The plaintiff brought a charge of discrimination alleging the defendant Board failed to promote him, discharged him, and subjected him to discriminatory terms and conditions of employment on account of his race. The EEOC found probable cause to believe there was discrimination, stating in part: "Title VII requires an employer to maintain a working environment free of racial intimidation. That requirement includes positive action where positive action is necessary to redress or eliminate intimidation." *Id.* at 192 n. 7. The district court granted summary judgment on the section 1981 claims because the plaintiff failed to allege invidious discrimination. The court also granted summary judgment on the discharge claim but tried the claim based on promotions and working conditions under Title VII.

This Court reversed the summary judgment, finding that the complaint set forth sufficient factual allegations of discriminatory intent to state a section 1981 claim. *Id.* at 193. The Court noted that section 1981 requires a demonstration of purposeful discrimination, but held the plaintiff may establish intent circumstantially "by alleging and proving discriminatory conduct, practices, or the existence of a signifi-

cant racially disproportionate impact." *Id.* (citations omitted). Finding an unresolved issue of material fact with respect to the Board's intent, this Court remanded for further proceedings. The Court noted that the plaintiff would have additional damage remedies available under section 1981 on remand. *Id.* at 195.

■ Appellee's construction of the *Smith* case as requiring in all cases a demonstration that an employer treated harassment claims of minority employees differently from those of white employees would erode severely the important protections courts have recognized under section 1981. An employer with a small number of minority employees could allow them to be harassed and subjected to slurs, simply do nothing, and avoid responsibility and liability simply because the minority employees can produce no incidents of harassment of white employees as contrasting treatment. The element of intent required in section 1981, as noted in *Leonard,* can be proved circumstantially. An employer intends discrimination where he condones racial harassment of employees.

In *Taylor v. Jones,* 653 F.2d 1193 (8th Cir.1981), the court upheld a district court's finding of employer liability under section 1981 for constructive discharge and maintenance of a hostile work environment. The district court had found the defendant liable for intentional discrimination in the constructive discharge of a black employee forced by a noxious racial atmosphere. The district court found that a white person would not have been treated in the same fashion. *Id.* at 1198. The plaintiff produced testimony that the workplace, a National Guard installation, was permeated with racial slurs, racially offensive jokes, hostility to blacks, and differing treatment of black workers. *Id.* at 1198–99. The pervasive atmosphere of prejudice was such that the employer must have become conscious of it. *Id.* at 1199. The court held that the plaintiff was entitled to relief under section 1981 for intentional discrimination upon sufficient proof of racial discrimination. *Id.* at 1200. It stressed that

the district court's " 'ultimate' finding of fact—that plaintiff bore her burden of persuasion that she had been the victim of deliberate discrimination—was well supported by factual findings that are not clearly erroneous." *Id.* at 1201 (citations omitted). The court stressed that the fact the supervisor charged with discrimination did not testify "speaks volumes." *Id.* at 1202.

■ Courts have considered a number of hostile work environment claims under both Title VII and section 1981. The hostile work environment claim is not a disparate treatment claim that requires no showing of intent. Courts have not erected a barrier to section 1981 claims for hostile work environment by requiring proof that management received complaints of harassment from white employees. *See Rodgers v. Peninsular Steel Co.,* 542 F.Supp. 1215 (N.D.Ohio 1982); *Lucero v. Beth Israel Hospital,* 479 F.Supp. 452 (D.Colo.1979).

■ The jury's finding of intentional discrimination by Chrysler management is supported by substantial evidence. Management was aware of plaintiff's many complaints of harrassment and condoned the situation by taking no steps to improve conditions and by seeking to intimidate plaintiff. No showing that it received complaints from white supervisors of harassment by minorities and responded differently is required. However, we observe that management, through Ferguson, did investigate a complaint presented to him by a white employee against Erebia in regard to the incident with Baum. There was no investigation of plaintiff's complaints, ostensibly because they were not presented to Ferguson. The fact that plaintiff's complaints were not relayed to Ferguson is the substance of plaintiff's complaint—lack of response by management.

■ Before turning to the issue of damages, we consider appellee's challenge to the jury instructions. There is no merit in Chrysler's contention that the jury should have been instructed on "legitimate nondiscriminatory reasons" and "pretext" for

Chrysler's actions. Such instructions are not appropriate in this area. Nor is there merit in Chrysler's argument that the jury should have been instructed that plaintiff cannot prevail if he participates in or condones an exchange of slurs. The district court concluded correctly that this issue was appropriate for the arguments of counsel rather than jury instructions. Counsel for appellee argued vigorously in her closing argument that an exchange or "crossfire" of slurs established that there was no hostile work environment. We conclude that the district court gave thorough instructions to the jury.

### III

■ Appellant challenges the jury's award of $10,000 compensatory damages arguing there was insufficient proof of actual injury such as emotional distress, embarrassment, or humiliation. Courts have allowed recovery under section 1981 for emotional distress, but there must be sufficient evidence to support the award. *Morrow v. Igleburger*, 584 F.2d 767, 769 (6th Cir.1978), *cert. denied*, 439 U.S. 1118, 99 S.Ct. 1027, 59 L.Ed.2d 78 (1979).

In *Carey v. Piphus*, 435 U.S. 247, 264, 98 S.Ct. 1042, 1052, 55 L.Ed.2d 252 (1978), the Supreme Court held that compensatory damages cannot be awarded absent proof of injury. The Court, in a procedural due process case, noted that emotional distress may be proven "by showing the nature and circumstances of the wrong and its effect on the plaintiff." *Id.* at 263–64, 98 S.Ct. at 1052–53. Distress injury may be evidenced by one's conduct and observed by others. *Id.* at 264 n. 20, 98 S.Ct. at 1052 n. 20. The Court emphasized that difficulties of proof did not excuse the requirement of proof that such injury actually was caused. *Id.* at 264, 98 S.Ct. at 1052. The Court remanded the case for an award of nominal damages if the trial court found the school suspensions justified. *Id.* at 267, 98 S.Ct. at 1034.

In *Rodgers v. Fisher Body Division, General Motors Corp.*, 739 F.2d 1102 (6th Cir.1984), *petition for cert. filed*, — U.S. —, 105 S.Ct. 1759, 84 L.Ed.2d 821 (1985), this Court discussed the standards of proof of mental distress required in a section 1981 action. The plaintiff sought recovery based on his testimony that he suffered humiliation after his layoff because an error in the employment security office left him without unemployment compensation. He testified that his humiliation resulted from long waits at the employment security office, the repossession of his automobile, and his inability to provide for his family. *Id.* at 1108. This Court was unable to determine which part of the $300,000 award the jury apportioned to lost wages and which part was attributed to emotional distress. *Id.* We found the evidence insufficient to support the high compensatory damages award whether for emotional harm or for lost wages. *Id.* The Court therefore remanded the case for trial solely on the issues of compensatory and punitive damages. *Id.* at 1109. The Court stressed: "While jurors might easily infer that going on welfare and losing one's car would cause emotional distress, plaintiff has not demonstrated his mental distress with the specificity required by *Carey v. Piphus.*" *Id.* at 1108.

In the present case, plaintiff's only proof of emotional harm consisted of his statements that he was "highly upset" about the slurs and that "you can only take so much." His conduct in complaining to management on a regular basis also demonstrated a high level of concern. This proof, however, is insufficient to support the verdict for compensatory damages because it does not satisfy the requirements of *Rodgers* and *Carey v. Piphus*. This case is therefore remanded to the district court with directions to award nominal compensatory damages.

■ We reject appellee's contention that there was insufficient evidence to support the punitive damages award. As noted in Rodgers, "punitive damages may stand independently of compensatory." 739 F.2d at 1109. The issues of willfulness underlying the punitive damages award are separate from issues relating to compensatory

damages. The jury awarded punitive damages based on instructions requiring it to find the defendant's actions were "wanton or oppressively done." (T. 342). The court stated that a "failure to act is wantonly done if done in reckless or callous disregard of or indifference to the rights of one or more persons, including the injured person." (T. 343).

The jury's award for punitive damages was supported by substantial evidence. Plaintiff testified that he continuously brought the problem of racial slurs to the attention of his supervisors and that they failed to take any action to rectify the situation. It is significant that Chrysler did not introduce as rebuttal witnesses any of the employees named by Erebia as having bombarded him repeatedly with ethnic slurs on virtually a daily basis. Neither were the supervisors to whom Erebia testified that he made complaints and asked for relief over and over again called as witnesses. Malice may be inferred from conduct and surrounding circumstances. Additionally, the jury could find malice in Lenz's threat that he would hurt plaintiff economically for pursuing his complaints of harassment. Because the award is supported by substantial evidence, the court did not abuse its discretion in denying the motion for a new trial. Accordingly, the punitive damages award must stand.

This case is AFFIRMED in part, REVERSED in part, and REMANDED. Costs in this Court are taxed against appellant.

CORNELIA G. KENNEDY, Circuit Judge, dissenting.

I agree with the majority that persons of Mexican ancestry are entitled to the protection of section 1981 where, as here, they are discriminated against based on some perceived racial differences, as opposed to mere national origin discrimination. As noted in *Madrigal v. Certainteed Corp.*, 508 F.Supp. 310 (W.D.Mo.1981), Mexican-American ancestry is understood to signify a mixture of Spanish and Indian origins. I do not agree, however, that the evidence of discrimination in this case is sufficient to support a section 1981 violation.

As stated by the majority, an employer may be held liable for discrimination under a "hostile working environment" theory if the employer tolerates a working environment "so heavily polluted with discrimination as to destroy completely the emotional and psychological stability for minority group members." *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir.1971), *cert. denied*, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972). To establish a racially hostile working environment Erebia, a production foreman at Chrysler, relies on his testimony concerning two employees formerly under his supervision. Erebia testified that Rolland Forney refused to follow Erebia's instructions on a daily basis, from 1977 until Forney was laid off in 1980, because Erebia was Mexican and Forney was white; and that Forney would call Erebia names such as "wetback" and "tomato picker." Erebia further testified that from April 1980 to August 1980, when Erebia was foreman in a different department, he was subjected to racial slurs by Wilbur Wood, another subordinate. Since the two subordinates were in different departments, Erebia was subject to harassment by only one employee at any particular time.

The court in *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1297 (8th Cir.1981), articulated the applicable standard as follows: "Unquestionably, a working environment dominated by racial slurs constitutes a violation of Title VII. This is not to say, however, that all racial slurs rise to the level of Title VII violations. In this area, we deal with degrees." Racial remarks by a single subordinate do not create a working environment dominated by racial slurs. Racial harassment directed at an employee by a single supervisor can sufficiently poison the employee's working atmosphere, since a supervisor can dominate the workplace with respect to his subordinate. The attitudes of a number of co-employees can also control one's working atmosphere. But here we have the weakest case of all—a foreman claiming that a single one of his subordinates has, by using racial

epithets, "dominated" the foreman's working environment.

The degree of racial hostility found to constitute a racially charged working atmosphere in other cases has been considerably greater and more widespread than that faced by Erebia. For example, in *EEOC v. Murphy Motor Freight Lines, Inc.*, 488 F.Supp. 381 (D.Minn.1980), a black employee was subjected to a pattern of racial epithets written on blackboards and on signs on trucks; Ku Klux Klan crosses in the workplace; and constant racial harassment in the lunchroom by co-employees. Supervisors joined in the harassment and told the plaintiff he was a disgrace to his race. *Taylor v. Jones*, 653 F.2d 1193, 1198–91 (8th Cir.1981), involved a department-wide "dismal" racial atmosphere characterized by threats, fights, epithets, and display of a hangman's noose. Patterns of racial epithets by *supervisors* were held sufficient in *Leonard v. City of Frankfort Electric and Water Plant*, 752 F.2d 189 (6th Cir.1985), and *Walker v. Ford Motor Co.*, 684 F.2d 1355 (11th Cir.1982). The bigotry of one subordinate does not poison the working atmosphere to the extent it was poisoned in these cases.

A § 1981 violation requires a finding of intentional discrimination on the part of the employer. Intent may be inferred from the employer's tolerance of racial harassment "sufficiently pervasive as to alter the conditions of employment and create an abusive working environment," *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982). An employer free of discriminatory motives would not tolerate disruption of the workplace by racial harassment. Such an inference is not proper where, under the circumstances, a nondiscriminatory employer would not be expected to take further action. Here the employer's actions are fully consistent with the inference that Erebia's supervisors merely expected their foreman to handle a problem with his subordinate by himself. Erebia's immediate supervisor repeatedly told him to "build a case." Specific times, places, and witnesses would be needed to discharge or suspend a union employee. There is no evidence that Erebia, an experienced foreman, did build his case. The personnel manager, Lenz, advised Erebia that he should ignore verbal abuse from subordinates and not pay any attention to shop talk. The later of Erebia's two complaints to Lenz was in the summer of 1977, five and one-half years before suit was filed. An inference of intent to discriminate, proper when management tolerates racial harassment by supervisors or co-employees, is not necessarily proper when management tolerates a racially-based disciplinary problem a foreman has with a subordinate. The racially charged hostile working atmosphere referred to in Title VII cases is thus needed to supply the intent element as well as the discrimination element of a § 1981 claim.

The existence of a racially charged work atmosphere is a prerequisite to a finding of discrimination in this case. After stating this standard, the majority holds the employer liable for tolerating "repeated slurs" without considering whether repeated slurs by a subordinate are sufficient to establish a racially charged working atmosphere. In doing so the majority in effect holds the employer vicariously liable for the bigotry of an employee. As I would not find the evidence in this case sufficient to permit the jury to find a racially charged working atmosphere, I would reverse the judgment of the District Court. Were I to reach the issue, I would agree with the Court that plaintiff failed to prove compensatory damages.

Accordingly, I respectfully dissent.